1  KRISTEN CLARKE
   Assistant Attorney General
2  Civil Rights Division

3
   FARA GOLD
4  Special Litigation Counsel
   Criminal Section
5  Civil Rights Division

6      950 Pennsylvania Ave, NW
       Washington, DC 20530
7      Telephone: (202) 532-5158
       fara.gold@usdoj.gov
8
   Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                          OAKLAND DIVISION
12

13  UNITED STATES OF AMERICA,          )  NO. 22-cr-000016-HSG
                                       )
14        Plaintiff,                   )  UNITED STATES' SENTENCING
                                       )  MEMORANDUM AND MOTION FOR UPWARD
15     v.                              )  DEPARTURE OR UPWARD VARIANCE
                                       )
16  JAMES THEODORE HIGHHOUSE,          )
                                       )
17        Defendant.                   )
    _____)
18

19        The United States of America respectfully files this sentencing memorandum and moves this

20  Court to depart upward, or in the alternative, vary upward, from the United States Sentencing Guidelines

21  advisory range, and impose a sentence of 120 months (10 years) in prison.[1] An upward departure or

22  variance and the imposition of a sentence of 120 months in prison comports with the factors set forth in

23  18 U.S.C. § 3553(a), whereas the advisory guidelines range of 24-30 months in prison do not. This is a

24  significant increase, but a necessary one. A 120-month sentence reflects the seriousness of the

25  defendant's offenses, endeavors to promote respect for the law, and provides a just punishment for this

26

27        [1] United States Probation's recommendation is 84 months in prison. *See* Presentence
    Investigation Report (PSR), page 41, The PSR notes on page 43 that the recommendation is 60 months
28  in prison, but the United States clarified with U.S. Probation that Probation's recommendation is 84
    months in prison, as written on page 41.

particularly vile conduct where a chaplain exploited the vulnerabilities of those he was tasked with providing counsel and spiritual guidance.

## I. **Procedural Background**

On January 18, 2022, the United States filed a five-count information charging the defendant, a former Bureau of Prisons (BOP) chaplain at FCI-Dublin, with crimes related to his sexual abuse of an incarcerated female from of May 15, 2018 through February 9, 2019. (Doc. 1). Counts One and Two each charge the defendant with Sexual Abuse of a Ward, in violation of 18 U.S.C. § 2243(b) for engaging in a sexual act with L.I., a female inmate in official detention, who was under the defendant's custody, supervisory, and disciplinary authority. Specifically, the conduct alleged in Count One is that the defendant penetrated the victim's vulva with his penis. The conduct alleged in Count Two is that the defendant caused the victim to put her mouth on his penis. Counts Three and Four each charge the defendant with Abusive Sexual Contact, in violation of 18 U.S.C. § 2244(a)(4), for engaging in sexual contact with L.I., a female inmate in official detention, who was under the defendant's custody, supervisory, and disciplinary authority. Specifically, the conduct alleged in Count Three is that the defendant caused L.I. to touch his penis and the conduct alleged in Count Four is that defendant masturbated in front of L.I. Finally, Count Five charges the defendant with making false statements to federal agents in violation of 18 U.S.C. § 1001, when he falsely denied engaging in sexual acts and sexual contact with L.I.

On February 23, 2022, the defendant entered a guilty plea to the aforementioned counts in the information. This matter is set for sentencing on August 31, 2022.[2]

## II. **Offense Conduct and Uncharged Relevant Conduct**

The defendant's guilty plea establishes that he repeatedly sexually abused L.I., an incarcerated female, over the course of approximately nine months, all while he was acting in his capacity as a prison

---

[2] Counts One through Four each carry a minimum term of 5 years of supervised release up to life. *See* 18 U.S.C. § 3583(k) ("Notwithstanding subsection (b), the authorized term of supervised release for any offense under section . . . 2243, 2244 . . . is any term of years not less than 5, or life"). Because the parties mistakenly tracked 18 U.S.C. 3583(b) with regard to supervised release, the defendant was advised, and the plea agreement so reflects, that the maximum penalty for each of those four counts is three years of supervised release. The United States discussed this matter with counsel for the defendant on several occasions. It is the United States' understanding that the defendant has been fully advised of the supervised release penalties, and nonetheless wants to proceed with sentencing.

chaplain. He then twice lied to federal agents about it. (Doc. 8, page 3). Even after his guilty plea, despite claiming to U.S. Probation that he has taken "full responsibility," for an "inappropriate relationship," the defendant nonetheless continued to shift the blame for his predatory conduct to his unsatisfying marriage, one of the very excuses he repeatedly used to coerce L.I. into submitting to him. (Presentence Report (PSR), paragraph 59, 58, and 143). That conduct alone warrants a significant sentence, but the defendant's abuse of L.I. was not an isolated incident. He engaged in a pattern of sexual misconduct with several incarcerated females, one of whom only recently felt safe to report what happened to her once the defendant entered his guilty plea.

The United States incorporates by reference the facts set forth in the PSR, and sets out the facts below for emphasis and to supplement the PSR, all of which establish an ongoing pattern of sexual predation facilitated by the defendant's position of power over his victims.

### a. The Defendant's Sexual Abuse of L.I.

While incarcerated at FCI-Dublin, around November, 2017, L.I. sought out the defendant, a prison chaplain, having learned early in life that, "you can always trust a chaplain." She confided in him about her past, including that she had been sexually assaulted and suffered trauma as a result. The defendant told her that while he could not help her psychologically, he could help her spiritually. As the facts bear out, his every subsequent interaction was a means to groom her, i.e. he built a façade of trust and used the appearance of an emotional connection to manipulate and exploit L.I., in much the same way that abusers victimize children. To that end, just as he used his dissatisfaction with his marriage to coerce her, he also exploited his service in the Army, and then ultimately, L.I.'s relationship with God to manipulate her.

Initially, L.I. started working as an orderly at the chapel, and therefore the defendant saw her regularly in his office. The defendant began to engage in unwanted physical contact around May, 2018, slowing escalating in gravity as he tested how far his abuse could go. First, he tightly hugged L.I., grabbing her buttocks and rubbing his crotch up against her such that she could feel his erect penis. He asked for a kiss. When she said "no," he kissed her on the cheek, and told her that would be sufficient for the time being. Shortly thereafter, while L.I. was getting supplies from a closet, he came up behind her, grabbed her waist, pushed her into a wall, and began "dry-humping" her. She asked him what he

was doing, and he responded that he could not control himself.

He then began to repeatedly tell L.I. that he was sad because he had not received oral sex in a long time, and in an effort to cajole her perform that act, he asked her if she wanted to make him happy. He further justified his requests by telling her that everyone in the Bible has sex. At first, however, the defendant did not force L.I. to perform oral sex. Instead, he grabbed her hand, forcing her to masturbate him until he ejaculated on the floor of his office. But he continued to cajole her, telling her that God brought them together, and guilting L.I., making it seem like she owed him oral sex for all that he had done for her. The defendant exploited both his position as a chaplain and L.I.'s faith by quoting Biblical parables and referencing King David and his many wives as a justification for his conduct. She finally gave in, and the defendant had her perform oral sex on him every week for about two months. On occasion, he digitally penetrated her vagina, telling her that he wanted to "loosen her up."

After several months, he started performing oral sex on L.I. and engaging in vaginal intercourse in his office. In fact, the defendant would use the holidays as a reason to engage vaginal intercourse. For example, he told her that on Veteran's Day, she needed to serve her country, and on Thanksgiving, she needed to show her gratitude for him.

When L.I. became concerned that the defendant might impregnate her, the defendant told her that he had a vasectomy. When she asked him to use a condom to prevent infection, he refused to wear one. It should be noted that when the defendant was first interviewed by federal agents, he acknowledged telling L.I. that he had a vasectomy, though he denied engaging in sexual conduct. When he was re-interviewed by agents in the presence of his attorneys a year later, he recanted that he ever told L.I. that he had a vasectomy. Notably, DNA analysis of a pantyliner that L.I. saved after one of the sexual assaults revealed the presence of semen, but no sperm. This is consistent with the ejaculate of a vasectomized male. Moreover, mostly because of the lack of sperm, the semen was unsuitable for standard STR DNA analysis. However, it was suitable for Y-STR analysis, which revealed that the semen was consistent with the defendant's male lineage. Because no one else in the defendant's male blood line worked at FCI-Dublin or had access to L.I., the analysis was highly corroborative and inculpatory.

The defendant's sexual abuse of L.I, occurred in his chapel office where no one would be able to

see them. Moreover, the defendant would put his radio next to them at full volume so that he could hear if someone was coming, and he would watch the surveillance monitor on his desk as he was sexually assaulting L.I., all in an effort to avoid detection.

### b. L.I.'s Disclosure and Report to Federal Law Enforcement

L.I. considered reporting the defendant many times, but he warned her that if she ever told "no one will believe you because you're an inmate, and I'm a chaplain." Moreover, he told her that even if she did report him, he would end up with a mere slap on the wrist, just like every other employee at FCI-Dublin who engages in similar behavior. He also played on her sense of Christian forgiveness, telling her that if she reported him, he would lose his job and his family. L.I. did not want to be responsible for that, and to this day, feels that same sense of guilt.

The staff members at FCI-Dublin solidified L.I.'s concerns about not being believed. One counselor was particularly vocal about inmates "snitching" on corrections officers, advising them to instead "tell Trump about it." When L.I. inquired about the procedure for reporting sexual assault, a different corrections officer told her that she would be sent to the Segregated Housing Unit (SHU) if she did so. Although the purpose of doing so is for protection of the victims, the SHU is disciplinary housing, and as result, inmates lose privileges and are in essence –even if not in purpose – treated like they did something wrong.

The defendant's conduct only came to light because in February 2019, L.I. told another corrections officer that a chapel staff member had been taking advantage of her, and that she had been doing things of which she was ashamed. According to that officer's report, L.I. "inadvertently mentioned being raped." That officer referred the matter to the prison's security investigative services (SIS). Thereafter, L.I went to the hospital for a sexual assault nurse examiner's (SANE) exam, i.e. rape kit, and the federal investigation ensued. To this day, L.I. is unaware as to how federal authorities learned of the defendant's abuse.

### c. The Defendant's Statements

The defendant gave several voluntary statements to federal investigators. Agents with the Federal Bureau of Investigation (FBI) and the Department of Justice Office of the Inspector General (OIG) jointly conducted a two-hour recorded interview, shortly after they learned about the defendant's

conduct in February 2019. During that interview, the defendant (1) generally denied talking to inmates about anything of a sexual nature; (2) specifically denied making sexual comments to two other inmates, T.M. and N.J., who, as set forth below, previously reported the defendant and whom during his interview, the defendant maligned as manipulative; and (3) denied, with specificity, engaging in sexual acts with L.I., also claiming that she was a manipulative liar. None of these denials were true.

In August, 2019, the FBI and OIG again met with the defendant, at which time he agreed to take a polygraph examination. Instead of taking the examination (likely because he knew he would not pass), he admitted that he engaged in sexual conduct with L.I. He handwrote an eight-page statement, in which he described L.I. as the aggressor, claiming that she grabbed his genitals against his will, made him masturbate in front of her, coerced him into allowing her to perform oral sex on him, and intimidated him into having vaginal sex with her.

Despite taking "full responsibility" for his actions as he wrote in his statement, when the defendant again met with an OIG agent in February 2020, in the presence of his lawyers, he claimed that he lied in that written statement. Instead, he claimed that he told the truth in his first recorded interview, when he denied engaging in sexual conduct. Again, he claimed that L.I. was the aggressor, stating that if surveillance cameras had the ability to record, it would show that he thwarted her advances. Of course, the defendant well knew that the cameras did not record, and he also knew how to remain out of sight of the camera lens.

d.  Uncharged Relevant Conduct and Victimization of Other Women

The defendant engaged in a pattern of unwanted sexual, predatory conduct with at least five additional women, ranging from inappropriate comments to leering and unwanted touching to sexual assault from the time he was employed as a chaplain for the Veterans Administration (VA) Hospital in Palo Alto in 2014 to 2016, throughout his employ at FCI-Dublin until 2019, when he was placed on administrative leave. Had this case proceeded to trial, the United States would have sought to admit the

accounts of these women, pursuant to Fed. R. Evid. 413[3] or 404(b).[4] This evidence is similarly relevant here to establish the defendant's propensity to commit sexual assault. It further corroborates L.I.'s account and rebuts any argument by the defendant that L.I. was the aggressor. His behavior with other females over whom he had authority illustrate a pattern of predation, and all of it supports of an upward variance.

Most recently, in May 2022, three months after the defendant entered his guilty plea in this case, W.P., a female inmate now incarcerated in a BOP facility out-of-state, reported to federal officials that when she was housed at FCI-Dublin, in late 2017 through early 2018, the defendant engaged in vaginal intercourse with her in his chapel office on multiple occasions. W.P. initially sought out the defendant, the prison chaplain, right away because she was "seeking peace about ow to deal with her sentence." At first, W.P. attended the defendant's classes, where he spoke of dating, women hurting him, and how he could not find love anywhere (topics that the head chaplain later told federal investigators were entirely inappropriate). Feeling like she could relate to the defendant, W.P. saw him for one-on-one counseling sessions, particularly when she was distraught. W.P. described a pattern of behavior similar to what L.I. described, to include the defendant complaining about his wife in an effort to gain her trust and sympathy.

W.P. explained that she welcomed the hugging, touching, and companionship because she was so lonely. The defendant's conduct then escalated to vaginal intercourse on about four occasions. W.P. did not view these acts as "rape," explaining that she been raped in prison before, where she was thrown to the ground, and this was different. W.P. explained that the intercourse was "more [the defendant's] thing," and she just wanted love and comfort.

Finally, in April, 2018, just before the defendant started engaging in vaginal intercourse with

---

[3] Rule 413 allows evidence of other sexual assaults to be used for any matter "to which it is relevant" when the defendant is charged with a sexual assault. Fed. R. Evid. 413(a). *United States v. LeMay*, 260 F.3d l018, 1026 (9th Cir. 2001) (concluding that there is nothing "fundamentally unfair" about the allowance of propensity evidence); *United States v. Redlightning,* 624 F.3d 1090, 1120 (9th Cir. 2010) ("Evidence that tends to show that [a defendant] committed another sexual assault ... tends to show that [the defendant] had the propensity to commit another sexual assault.").

[4] Rule 404(b) may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," or to rebut the defense of consent. *See* Fed. R. Evid 404(b).

L.I., W.P. sought a transfer to another facility because FCI-Dublin was "wild." She attempted to report some of the rampant sexual misconduct involving staff and inmates, but in response, an officer shrugged and reminded her that she was leaving the facility. W.P. decided only recently to report the defendant because she is in therapy, and did not think she would benefit from it unless she reported it. Moreover, upon realizing that she was not the defendant's "only one," she thought she might be believed, and in turn, stop him from victimizing other women.

Around the same time that the defendant was abusing W.P., and almost a year to the day before L.I. reported the defendant, on February 16, 2018, T.M., another inmate, reported the defendant's misconduct to a corrections counselor. T.M and N.J. had been in the defendant's office when he questioned them – using graphic and objectively vile language -- about their sex lives in the prison. The defendant further claimed to be a sex therapist, and offered up his office as a place for them to have sex. Although the corrections officer to whom T.M. spoke generated a report and referred the matter to SIS, investigators did not initiate an investigation.

Years later, when federal agents interviewed N.J., she was unaware that T.M officially reported the defendant, undercutting any argument by the defendant that these women were manipulative and conspiring against him. N.J. corroborated what T.M. reported in real time, and further explained that the defendant's conduct scared them. He forced them to remain in his office for an hour, as the defendant sat with a visible erection. N.J. explained that they thought he was going to try to molest or assault them, and they feared that if they tried to defend themselves, they would get into trouble because no one would believe them over the chaplain.

N.J. also described that subsequent to that, when she spent time in the SHU for disciplinary purposes, contrary to the behavior of other corrections officers, the defendant would arrive just as she would emerge from the shower and seemingly leer at her. The females in the SHU referred to the defendant as "predator" because of the way he would watch them through the windows of their cell doors.

T.M. and N.J.'s accounts were similar to that of D.A. who told federal authorities that when she was incarcerated at FCI-Dublin in January 2019 – just a month before the defendant's conduct with L.I. came to light –the defendant called her to his office for a counseling session. He closed the door and

began discussing masturbation and her need for "self-care," offering to help her engage in such care. He also commented that the commissary should be selling dildos. After that, she avoided the defendant.

In 2015, while the defendant was employed as a chaplain for the Palo VA Hospital, the defendant met with S.G., a female patient who was receiving residential treatment for post-traumatic stress disorder related to being raped while serving in the Army. During her counseling sessions with the defendant, the defendant seemed "overly interested" in the details of her prior rape, asked for details of her physical relationship with her husband, and offered up ways in which to "spice up" her sex life with her husband. The defendant seemed "creepy" and made S.G. feel uncomfortable. She explained that he would put his arm around her, touch her thigh, and hug her even she told him not to touch her. As S.G. described it, it was as though the defendant was taking advantage of her own vulnerability for his personal pleasure.

Also, during the defendant's employ as a chaplain at the Palo Alto VA Hospital, a chaplain services assistant caught the defendant in an empty office with his pants and underwear down around his knees. She saw the defendant's penis, which appeared as though he had just ejaculated. The defendant later told the assistant that he had spilled water on his pants and had been wiping off the water when she entered the room – despite his pants being dry, and down past his knees. She reported the incident to chief chaplain, but nothing happened as result. [5]

### III.  <u>Legal Argument</u>

The United States Supreme Court has held that, although the Sentencing Guidelines are advisory in nature, courts "must consult these Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). The Supreme Court has emphasized that a district court must begin its sentencing proceedings by correctly calculating the applicable sentencing range, which serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

---

[5] As noted in the PSR, the defendant's abuse was not limited to his workplace. On April 14, 2022, the Alameda County Court denied the defendant's request for parental visitation, finding that there is "overwhelming evidence that there is a considerable risk to the minor if [the child] has continued contact with [the defendant]" citing a past finding of abuse. PSR, paragraph 135. Additionally, according to the defendant's former wife, the defendant previously told her while in the Army, a colleague accused him of sexual harassment, but the defendant claimed it was in retaliation because he rebuffed the colleague's advances.

Next, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; the need to afford adequate deterrence and to protect the public from further crimes of the defendant; and the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(1), (2), (4), (6).

Here, the advisory Sentencing Guidelines range is 24 to 30 months in prison. Because the United States agrees that the guidelines range was overall correctly calculated, it incorporates by reference the calculations as set forth in the PSR, paragraph 66-98. Nonetheless, the advisory range is insufficient to serve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a), and therefore the United States urges the Court to depart or vary from the advisory range and impose a sentence of 120 months in prison.

### a. Motion for Upward Departure and/or Variance

18 U.S.C. § 3553(b)(2))(A) governs the sentencing of Chapter 109A offenses (federal sexual abuse statutes), which includes violations of 18 U.S.C. §§ 2243(b) and 2244(a)(4)) for which the defendant stands convicted. That statutory subsection states that a defendant should be sentenced within the advisory guidelines range, unless "the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described." 18 U.S.C. § 3553(b)(2))(A)(i). Moreover, U.S.S.G. § 5K2.0(a)(1)(b) echoes this statutory provision, providing for a departure "in the case of child crimes and sexual offenses, [where] the court finds, pursuant to 18 U.S.C. § 3553(b)(2)(A)(i), that there exists an aggravating circumstance, of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." U.S.S.G. § 5K2.0(a)(1)(b). *See also United States v. Christensen*, 732 F.3d 1094, 1100-01 (9th Cir. 2013) (Sentencing court may conclude that the Guidelines do not sufficiently account for the harm caused by the defendant's conduct.)

Whether couched as variance in consideration of the 3553(a) factors or as a departure under U.S.S.C. § 5K2.0, the aggravating circumstances are myriad, and are indeed of a kind and to a degree

not adequately considered by the Sentencing Commission in formulating the guidelines.[6] Therefore, the advisory range does not achieve the objectives of the 3553(a) factors. Specifically, the advisory guidelines range of 24-30 months does not account for (i) the sheer number of times the defendant assaulted of L.I., his misconduct with other victims, and his pattern of conduct, (ii) the defendant's abuse of trust and exploitation of power (iii) the extent of the defendant's coercive conduct, and (iv) the defendant repeated efforts to cover up his conduct and deflect blame both to his victim and to his former wife. However, a 120-month prison term does, providing a sentence sufficient under 18 U.S.C. § 3553(a).

> i. *The Defendant's Ongoing Sexual Assaults of L.I., His Misconduct With Other Victims and His Pattern of Conduct*

The Supreme Court has repeatedly held that a trial court can and should consider uncharged relevant conduct when imposing a sentence in order to fully understand the degree and scope of the defendant's conduct. *United States v. Watts*, 519 U.S. 148, 151–52, (1997) (internal citations omitted) ("Highly relevant-if not essential [to the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."). This includes a defendant's past criminal conduct, even if such conduct did not result in a conviction. *Nichols v. United States*, 511 U.S. 738, 747 (1994); *see also Edwards v. United States*, 523 U.S. 511, 513–14 (1998); *United States v. Mustafa*, 695 F.3d 860, 862 (8th Cir. 2012) (a court may rely upon uncharged relevant conduct to enhance a sentence imposed within statutory limits).

> 1. Defendant's Uncharged Sexual Assaults of L.I.

Here, the defendant's uncharged relevant conduct is not just his depraved conduct with other inmates or while he was working for the VA Hospital. It is also the countless times that he sexually assaulted L.I. from the first time he rubbed his crotch up against her and grabbed her buttocks to his

---

[6] It is the United States' position that should the Court deviate from the advisory range, it is better done as a variance because a departure is a change to the sentencing range itself. Nonetheless, the facts that support both are the same. *See United States v. Grams*, 566 F.3d 683, 686–87 (6th Cir. 2009) (per curiam) (In contrast to a departure, "a 'variance' refers to the selection of a sentence outside of the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors of § 3553(a)."); *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1220 n.4 (10th Cir. 2008) (departures and variances are analytically distinct); *United States v. Miller,* 479 F.3d 984, 986–88 (8th Cir. 2007) (holding that a district court's conflation of departure and variance analyses was error, but finding it harmless error because the sentence was not unreasonable).

final act of penetrating her vagina with his penis before she underwent a SANE exam – and all of the acts of digital and vaginal penetration, oral sex, and groping in between. Whether it be oral sex that the defendant made L.I. perform about once per week for about two months, or each time he coerced her to submit to vaginal intercourse, often time around a holiday, or when he occasionally put his fingers in her vagina to "open her up," each of those sexual acts was a violation of federal law punishable up to 15 years in prison. And, each time the defendant put his hands on L.I.'s breasts, made her masturbate him, groped her buttocks, or touched her groin, her vagina, or even her upper thigh – regardless of whether it was under or through her clothing – the defendant committed a crime punishable up to two years in prison. Each could have been charged separately but for the fact that they were so common and voluminous that it was impossible to determine which types of assault occurred on which days.

Victims are already tasked with recounting in detail the abuse they endured so that prosecutors can properly bring charges, but no victim of ongoing, rampant abuse can or should have to delineate the exact type and corresponding date in order for her perpetrator to be held fully accountable. That is why defendants can be charged with one type of sexual abuse in one count that occurred multiple times over a period of time, as was done here. (Doc. 1). But that is also why courts can consider uncharged relevant conduct because it bears on the nature of the offense and the history and characteristics of the defendant, in accordance with the Section 3553(a) sentencing factors.

Moreover, even if the United States could charge the defendant with each sexual assault he committed on L.I., his recommended guidelines range would still not reflect the sheer volume of his conduct. His guidelines range was calculated based on four units, corresponding to each of the first four substantive counts in the information, pursuant to U.S.S.G. § 3D1.4. *See* PSR, paragraph 91. Any additional substantive charge, be it a violation of 18 U.S.C. § 2243(b) or 18 U.S.C. § 2244(a)(2) would not change the guidelines calculation because U.S.S.G. § 3D1.4 treats five units the same as four units. If, however, the defendant was charged with two more substantive crimes, be they violations of 18 U.S.C. § 2243(b) or 18 U.S.C. § 2244(a)(2) (because the Guidelines treats these offenses the same, *see infra*), then the total offense level would increase from a level 17 to a level 18, corresponding to 27-33 months. Thereafter, the Guidelines simply do not account for additional units, i.e. additional criminal conduct. That means that whether the defendant groped the victim's breasts six times or vaginally

penetrated her 66 times, or did some combination thereof 106 times, the advisory guidelines range would remain at 27-33 months. To that point, the Background to U.S.S.G. § 3D1.4 notes in a such a circumstance, a departure is appropriate, "In unusual circumstances, the approach adopted in this section could produce adjustments for the additional counts that are inadequate or excessive. . . Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines." Background, U.S.S.G. § 3D1.4.

This case provides the "unusual circumstance" where guidelines fail to account for the scope of the defendant's criminal conduct. Here, a prison chaplain repeatedly – indeed, on almost a weekly basis for nine months – used his authority and his position of trust to coerce an inmate into unwanted sexual conduct, from masturbation to oral sex to vaginal sex. The resulting guideline range of 27-33 months is manifestly inadequate, and a significant upward departure or variance is fully warranted.

### 2. Other Victims and the Corroboration of L.I.

Although the defendant's victimization of L.I. includes sufficient aggravating circumstances to warrant a departure or variance on its own, in order for a sentence to both reflect the degree of the defendant's misconduct and comport with the objectives of the 3553(a) factors, this Court should also consider the defendant's aforementioned uncharged relevant conduct with other women, i.e. the sexual abuse of W.P., leering at N.J. and other inmates as they emerged from the shower or were alone in the SHU, the unwanted touching and inappropriate comments of his patient at the VA Hospital, and the vile and sexualized discussions with T.M., N.J., and D.A.

In so doing, the Court should "generally appl[y] the preponderance of the evidence standard of proof when finding facts at sentencing." *United States v. Mejia–Luna,* 562 F.3d 1215, 1221 (9th Cir.2009) – and the Court may do so, even without hearing from T.M., N.J., D.A., S.G., and W.P., or any other witness directly, as each account has its own indicia of reliability and corroborates one another, in much the same way that Fed. R. Evid. 413 and 404(b) operate at trial. With regard to T.M. and N.J., the inmates whom the defendant made remain in his office, listening to his litany of sexualized comments and fearing that he would assault them, T.M. reported the defendant close in time to the incident, well before the advent of the federal investigation, rebutting any argument that either of these

women fabricated the misconduct in light of the federal investigation. An early disclosure of that nature would be substantively admissible at trial pursuant to Fed. R. Evid. 801(d)(1)(B). Moreover, when interviewed by the FBI and OIG, N.J. was not even aware that T.M. had reported the defendant, underscoring that she had no motive to make up her allegations. Similarly, D.A., the inmate to whom the defendant offered to help with masturbation, and S.G., his patient at the VA Hospital, spoke to federal authorities at the agents' request. They sought no benefit, had not interacted with the defendant in years, and for S.G., it instead resurfaced traumatic memory.

For her part, W.P., the most recent victim to come forward, only did so after she learned about the various charges brought against staff members at FCI-Dublin. She did so at what she perceived was peril to herself, fearing that she would get into trouble for allowing the defendant to have sex with her. She, too, reported the defendant's conduct without seeking benefit, be it a reduction in sentence or the filing of a lawsuit. Rather, she did so to see him held accountable, stop him from victimizing other women in the future, and to be afforded the opportunity to be heard.

These women's accounts show a pattern of conduct the degree to which the advisory guidelines range of 24-30 months does not capture. But their accounts do more than that. They rebut any argument that the defendant offers in mitigation – as he claimed in his handwritten statement (which he later recanted) – that L.I. was the aggressor and that he was the victim, vulnerable to her overtures. Indeed, these other women's accounts bolster the credibility of the L.I.'s account, and her telling of the way in which the defendant groomed her, exploited her, and repeatedly sexually assaulted her. The defendant's "inappropriate relationship," as he termed it, was not an aberration or a moment of weakness, but was rather a snapshot of a pattern of predatory conduct. Although it may have been cloaked in parables and prayer instead of threats of harm and violence, it was no less traumatizing and violating for his victims, and therefore a 120-month sentence is warranted.

### ii. *Abuse of a Position of Trust and the Exploitation of Power*

The advisory guidelines range wholly fails to capture the degree to which the defendant abused his position as a chaplain, further supporting a departure or variance. As noted in the PSR, for Counts One and Two, the base offense level for Sexual Abuse of a Ward, in violation of 18 U.S.C. § 2243(b) is 14. *See* U.S.S.G. § 2A3.3; PSR, paragraph 66. Although the offense itself contemplates a corrections

officer who sexually assaults someone in his custody, it does not account for someone like the defendant, who, as a chaplain, occupied and exploited an additional position of trust to facilitate his crimes. It would therefore follow that the adjustment for "Abuse of a Position of Trust," should apply. *See* U.S.S.G § 3B1.3 ("If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level").

However, U.S.S.G. §§ 2A3.3 and 2A3.4, the governing guidelines for Counts One Through Four, expressly prohibit the applicability of the Abuse of Position of Trust adjustment in Application Note 4 of each section, likely because the Sentencing Commission viewed "abuse of trust" as part and parcel of a corrections officer abusing his authority to sexually abuse an inmate. In that vein, the Sentencing Commission likely did not fathom having to articulate a separate adjustment for a prison chaplain who, while also serving as a corrections officer, engaged in similar behavior – which is why courts have the discretion to upward vary or depart pursuant to 18 U.S.C. § 3553(b)(2))(A)(i) and U.S.S.G. § 5K2.0. *See, e.g. U.S. v. Hosea Lee*, 5:21-cr-00084-DCR-MAS (E.D. Ky, August 1, 2022) (District Court granted an upward variance and imposed an 80-month sentence on a BOP corrections officer, whose guidelines range for multiple counts of Sexual Abuse of a Ward was 18-24 months, where the variance was in part was based on the defendant abusing an additional position of trust as a Drug Treatment Specialist to commit his crimes). *See also* U.S.S.G. 5K2.0(a)(2)(B) ("A departure may be warranted in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence.")[7]

       *iii.* <u>The Defendant's Coercive Conduct and the Inadequacy of the Guidelines</u>

The defendant pleaded guilty to two counts of Sexual Abuse of a Ward, in violation of 18 U.S.C.

---

[7] Based on agreement of the parties, the Abuse of Position of Trust adjustment was applied to Counts Three and Four even though, given how the counts group pursuant to § 3D1.4, it did not change the overall guidelines calculation, *See PSR*, paragraphs 91-94. However, upon further review of the U.S.S.G., it should not have been included. *See* U.S.S.G. § 2A3.4, Application Note 4. That is because two levels were added due to the victim being in the custody of the defendant, and therefore the Abuse of Position of Trust adjustment does not apply. In theory, this error benefits the defendant, but in practice, it benefits no one because even when included, it did not impact the overall calculation.

§ 2243(b), in Counts One and Two. They each carry a maximum penalty of 15 years in prison, and yet the base offense level for such a violation is a level 14, pursuant to U.S.S.G. § 2A3.3, which corresponds to 15-21 months in prison. These guidelines are woefully inadequate to reflect the nature and circumstances of the defendant's conduct. There are few adjustments or enhancements available to increase the guidelines range except, as here, where the defendant lied to federal agents and received a two-level increase pursuant to U.S.S.G. § 3C1.1. But that hardly captures the egregious and repeated nature of the defendant's crimes, as well as the degree to which he victimized a marginalized population.

When juxtaposed against the governing guideline for Counts Three and Four (Abusive Sexual Contact), the inadequacy of Section 2A3.3 and its base offense level of 14 is stark. Consider that for Counts Three and Four, the applicable guideline is Section 2A3.4, and that applies to all violations of 18 U.S.C. § 2244, not just to subsection (a)(4) to which the defendant pleaded guilty. The base offense level is 12 and two levels are added because the victim was in the custody, care, or under supervisory control of the defendant, pursuant to U.S.S.G. § 2A3.4(b)(3). *See* PSR, paragraph 80. Therefore, in this case, the offense level for Abusive Sexual Contact and for Sexual Abuse of a Ward is the same: a level 14. In short, it is the same for each of all four counts, despite the obvious differences in severity and conduct.

To put a finer point on it, the Sentencing Commission recommends the same sentence for the defendant when he made the victim touch his penis as it does for the defendant when he penetrated the victim's vagina with his penis, even though for the former, the maximum statutory penalty is two years in prison (Count Three) and for the latter, the maximum penalty is 15 years in prison (Count One). Inexplicably, the United States Sentencing Guidelines treat groping of an incarcerated person the same as penetrating her or making her perform oral sex.

Moreover, the guidelines for Sexual Abuse of a Ward (18 U.S.C. § 2243(b) are disparately lower than either of the other two federal sexual abuse statutes in Chapter 109A, *i.e.* 18 U.S.C. § 2241 (Aggravated Sexual Abuse) and § 2242 (Sexual Abuse), where the base offense level is at least a level 30 (and 32 if the victim is in custody). *See* U.S.S.G. § 2A3.1. Admittedly, violations of those other sexual abuse statutes require either some sort of physical force or fear of physical harm. But an 18-level benefit for a chaplain who wields his authority and frankly, God, as a weapon instead of threatening to harm the victim (because he doesn't need to in order to effectuate his crime) strains logic and fails to

accurately capture the depravity of his actions, the coercive nature of the prison environment, and the disparate power dynamic between the defendant and the victim.

To be sure, 18 U.S.C. § 2243(b) itself accounts for the foregoing in that it is a strict liability offense with a 15-year maximum penalty. That maximum penalty recognizes that consent is not a defense in such an inherently coercive environment, The Ninth Circuit has similarly recognized that "allowing consent as a defense may permit courts to ignore the power dynamics between a prisoner and a guard and to characterize the relationship as consensual when coercion is clearly involved," *Wood v. Beauclair*, 692 F.3d 1041, 1048–49 (9th Cir. 2012) (establishing rebuttable presumption that a prisoner cannot consent for the purpose of civil actions pursuant to 42 U.S.C. § 1983). But it is almost as if the Guidelines equate not having to prove lack of consent with the presence of consent. That is not the case here.

L.I. did not consent to the defendant's conduct. As the Supreme Court has held, ""[c]onsent" that is the product of official intimidation or harassment is not consent at all. [Individuals do not consent] when they are coerced to comply with a request that they would prefer to refuse." *Fla. v. Bostick*, 501 U.S. 429, 438 (1991). L.I. acquiesced to the defendant's advances because he was her chaplain, and as she explained, "you can always trust a chaplain." He exploited her faith in God, and her need for guidance, and in fact, when she expressed reluctance, and his cajoling were at times proving futile, the defendant grabbed her hand and forced her to masturbate her, or pushed her into a closet and "dry-humped" her, or bent her over the desk and penetrated her. Just because it was not brutally violent does not mean it was not rape. That is why the defendant faces a maximum penalty of 15 years on each of the top two counts – and that is why the defendant told the victim that no one would believe her if she reported him. Where two adults are truly consenting, one need not threaten the other; one need not coerce the other. But the defendant did, and his sentence should reflect that.

To that point, the United States Code does not yet have in effect an analogous statute making nonconsensual or coercive sexual acts a crime, which may, in part, explain the inadequacy of the federal sexual abuse guidelines to account for coercion. *See, e.g., United States v. James*, 810 F.3d 674, 676 (9th Cir. 2016) ("Federal law lacks a generic statute addressing nonconsensual rape, as every state has."), Thankfully, that has since changed with the 2022 Reauthorization of the Violence Against Women Act.

(VAWA) when a new statute will go into effect on October 1, 2022. [8] Until then, the guideline for a violation of 18 U.S.C. § 1591(b)(1) (sex trafficking by coercion) is likely instructive because such violations are most analogous to the gravity and degree of the defendant's conduct, that is, where he repeatedly sexually exploited an essentially indentured victim in an inherently coercive setting, over whom he had complete emotional and mental control. The base offense level for such an offense is 34, pursuant to U.S.S.G. § 2G1.1(a)(1), which provides a guideline range of 151-188 months—31-68 months greater than the 120 months that the United States is asking the Court to impose, but much more in line with the nature of the offense and the 3553(a) factors than the advisory guidelines range of 24-30 months.

### iv.   *The Defendant's Attempts to Cover Up His Conduct and Deflect Blame*

When the defendant pleaded guilty to Count Five for making false statements to federal agents, it was specifically for the lies he told during his first recorded interview when he denied engaging in any sexual conduct with L.I. For that lie, two levels were added to the defendant's offense level pursuant to U.S.S.G. § 3C1.1. *See* PSR, paragraph 70. But those two levels do not account for the defendant's subsequent repeated lies to federal authorities and his constant attempts to shift blame, in itself an aggravated circumstance the degree to which is not captured by the recommended range of 24-30 months in prison.

As noted above, not only did the defendant lie to OIG and FBI agents when he initially denied any sexual conduct with L.I., he likewise explicitly and with specificity denied making sexual comments to T.M. and N.J. Months later, knowing that he would fail a polygraph examination if he continued with those denials, he then hand-wrote an eight-page statement, in which he admitted to some of the

---

[8] Congress has since rectified this with passage of 2022 VAWA, in which it enacted 18 U.S.C. § 2242(3) (criminalizing "knowingly engag[ing] in a sexual act with another person without that other person's consent, to include doing so through coercion). That statute will be punishable up to life in prison.

Also as part of VAWA, Congress enacted 18 U.S.C. § 250, a penalty statute for civil rights offense involving sexual misconduct. When charged in conjunction with 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law), a government actor, like the defendant, who engages in nonconsensual or coercive sexual acts with an inmate will face up to life in prison, and will likely have an offense level of 38, pursuant to U.S.S.G. §§ 2H1.1; 2A3.1, which corresponds to 235-293 months in prison, far greater than the 120 months the United States is seeking in this case. Though that calculation is dependent on what the Sentencing Commission decides with regard to the guideline for the above-referenced, newly-enacted 18 U.S.C. § 2243(3).

misconduct with L.I., and although he stated that he was taking "responsibility", he rendered that word meaningless when he then claimed, "I do feel that I was manipulated and victimized and taken advantage of by this inmate [and] that she sought to compromise me." PSR, paragraph 41. He then asked for mercy in the name of his young child and gratuitously cited to the child's disability as a means to mitigate is own misconduct.

But such deflection and victim-blaming are common among sex offenders. This defendant is different because he took it a step further and met again with an OIG agent and two Assistant United States Attorneys, and in the presence of competent counsel, had the audacity to lie again. He retracted his handwritten statement, claiming it was a lie and that he never engaged in the conduct to which he has since pleaded guilty in the face of inculpatory DNA evidence.

And, despite his words to the contrary, it is clear that the defendant neither accepts responsibility nor can stop himself from lying, continuing to excuse his commission of sexual assault as a ramification of his failed marriage, and incredibly claiming that his treatment of L.I. was not indicative of how he treats women. (PSR, paragraph 142). Indeed, it absolutely reflects the value he has for women, and more specifically, the value he has for those women to whom he swore a Constitutional oath to protect and keep free from sexual abuse when he was hired by BOP to serve as corrections employee and a chaplain.

For sure, the advisory guidelines fail to adequately account for the degree of lies and blame-shifting that snaked its way through this case, the defendant's blatant disrespect for law enforcement, and his inability to accept that he has agency over what he does with his own body parts. For that, a substantial sentence is warranted.

b. The 3553 Factors Warrant a 120-Month Sentence

The United States' recommended sentence of 120 months in prison is sufficient but not greater than necessary to serve the purposes of sentencing under 18 U.S.C. § 3553(a). The advisory guidelines range of 24-30 months does not serve those purposes. A sentence of 120 months takes into consideration the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). It further reflects the seriousness of the offense by accounting for the impact on the victims, both charged and uncharged, and it promotes respect for the law by holding the defendant accountable for obstructing justice, therefore providing an overall just punishment for the defendant's

crimes. *See* 18 U.S.C. § 3553(a)(2)(A). Such a sentence aims to deter future misconduct within FCI-Dublin, and to protect the public from the defendant's future crimes so long as he is incarcerated. *See* 18 U.S.C. § 3553(a) (2)(B), (C). Finally, a 120-month sentence will not create unwarranted sentencing disparities among defendants who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a) (6).

i. *Nature of the Offense and the History and Characteristics of the Defendant*

The nature and circumstances of the defendant's offenses warrant an upward variance or departure and the imposition of a120-month prison sentence. *See* 18 U.S.C. § 3553(a)(1). Rather than reiterate all of the aforementioned aggravating circumstances that go to the heart of the Section 3553(a) factors, and this one in particular, U.S. Probation succinctly captured the need for such a sentence, as it wrote in the PSR, page 43:

> The heinous actions perpetrated on the victims in this case cannot be ignored or justified. At the time the offense was committed, [the defendant] was an employee of the BOP and was responsible for conducting himself in compliance with local, state, and federal law, and the United States Constitution. However, instead he used his power and position to prey upon the victims. The predatory nature of the offense is troubling especially since it happened over a period of nine months and the victim was an inmate who was not able to consent. The four incidents he is being held accountable for are also not the only incidents that occurred with the same victim. Additionally, there were multiple other victims in this case who recently came forward and are not accounted for in the guidelines calculations. The victims were all vulnerable and all continue to suffer from emotional pain and trauma. The damage to the victims is immeasurable, multi-faceted, and lifelong.

To that last point about the damage to the victims, T.M. and W.P., in particular, wrote in their victim impact statements (VIS) of the irreparable harm that the defendant's actions caused when they spoke of their faith, and the way in which they were exploited. As T.M. wrote, "I don't even go to Church anymore because of him. I have no trust in the Church and really, I don't trust anyone because of what he did. I have no faith in the BOP because they did nothing to help me – even after he was reported, he was allowed to stay there and do this to other women.  He took advantage of women in prison and preyed on us." (T.M. VIS, Attachment 2).

Likewise, W.P. wrote, "What he did to me makes me distrusting of everything and everyone and

it makes me angry. I blame myself although I know I'm not responsible for his actions. I blame the BOP for allowing this to go on for so long - it went on for SO long. I feel dirty and I feel like this is horrible and he took advantage of my vulnerability – he used God to get close to me and for his own benefit." (W.P. VIS, Attachment 3).

On the other hand, L.I. wrote in her VIS about how she used her faith to move past sexual assault, as she explained, "Together with my God, I can break through the clouds of isolation and stigma of being the victim of sexual assault and abuse can be dissipated and the burden of shame is lifted, so that the miracles of healing can occur." (L.I. VIS, Attachment 1). Sadly, that abiding faith and belief in God only illustrates how the defendant was able to exploit it to his own end. It is what makes the defendant's conduct so appalling. He preyed on those who sought out his counsel, who needed his guidance and prayers, and in whom they confided their own trauma. Such conduct warrants a sentence of 120 months prison.

ii. *Seriousness of the Offense, Respect for the Law, Just Punishment*

Much of this memorandum already addressed the seriousness of the defendant's offenses and the need for a just punishment. The United States will therefore only underscore one final point with regard to the importance of promoting respect for the law. It is especially troublesome and contributes to the erosion of the rule of law when federal government actors who have sworn to uphold the Constitution, flout the law and their oath as the defendant repeatedly did throughout his interaction with the victim and throughout the pendency of the investigation that led to his charges. Courts have held that where law enforcement officers, as corrections officers are, abuse their positions of authority, such offenses should be treated more seriously than crimes committed by private citizens. This is precisely for the purpose of promoting respect for the law. *See United States v. Hebert*, 813 F.3d 551, 563 (5th Cir. 2015) (affirming an upward variance in the sentencing of a defendant-officer based on the district court's finding that the defendant abused his position of trust when committing the offense); *United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000) ("A defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by [an officer] constitutes an abuse of a public position."). With that in mind, and with the objective of promoting respect for the rule of law and the Constitution, the defendant should receive a sentence well above

recommended advisory range.

### iii. _Deterring Future Misconduct and Protecting the Public_

The defendant exploited his position as a chaplain to sexually assault the victim, having engaged in similar behavior in the past with impunity because he assumed, like he warned L.I., that no one would believe her because she was an inmate and he was a chaplain. Perhaps more significantly, he told her that even if she did report him, he would end up with a mere slap on the wrist, just like every other employee at FCI-Dublin who engages in similar behavior. What the defendant was essentially telling L.I. was that even though he, like every BOP employee, knows that it is against the law to engage in sexual conduct with inmates, neither the moral wrong nor the threat of prison would be enough to deter him. _Flores v. County of Los Angeles_, 758 F.3d 1154, 1160 (9th Cir. 2014) ("If the threat of prison time does not sufficiently deter sexual assault, it is not plausible to assume that a specific instruction not to commit sexual assault will provide such deterrence."). Therefore, the United States hopes that getting caught, convicted, and sentenced to 120 months in prison will deter the defendant from committing sexual assault upon his release. If nothing else, a sentence of 120 months in prison can ensure specific deterrence and the safety of the community for the eighty-five percent of the 120 months that the defendant remains imprisoned.

Such a sentence will deter defendant specifically and aims to deter other federal corrections officers more generally. Deterrence is particularly important where law enforcement officers abuse their authority, as they occupy positions that "'provid[e] the freedom to commit a difficult-to-detect wrong.'" _United States v. Cui_, 106 F.3d 409, 2 (9th Cir. 1997) (internal quotations omitted). There are few crimes more difficult to detect than sexual assault, when there are rarely independent witnesses, and the case is often reliant on the credibility of the victim. It therefore becomes that much more important to show would-be perpetrators that they will be held accountable, even when they think there is no one to bear witness but their victim.

When the defendant told L.I. that no one would believe her because he is a chaplain and she is an inmate, he was further perpetuating the fallacy that women – and more, specifically, incarcerated women – lie about rape. And he was able to confidently make that pronouncement to L.I. because it was part of the culture within the prison to automatically disbelieve inmates. For sure, the defendant's

conduct warrants a 120-month sentence, but it also may have the added benefit of underscoring the Constitutional oath that all corrections officers take to ensure that incarcerated women are free from sexual assault, and the necessity of taking such allegations seriously, even when those allegations are premised on the word of a victim.

### iv. _Avoiding Unwanted Sentencing Disparities_

No two cases are alike. Nor is the impact of sexual assault the same for any two victims. The United States therefore considers each case individually when making a sentencing recommendation, though similarly situated cases help inform such a recommendation. Likewise, 18 U.S.C. 3553(a)(6) states that, when imposing a sentence, the Court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here, however, BOP employees who have been convicted of violating 18 U.S.C. § 2243(b) throughout the United States have been sentenced to a range of prison terms, depending on a range of factors. As the cases below set out, no one sentence will create a sentencing disparity, and certainly not an unwarranted one. Moreover, a sentence of 120 months, although a substantial deviation, is still only three-quarters of the 15-year maximum penalty for any one violation of 18 U.S.C. § 2243(b).

There are several cases throughout the country in which courts have imposed guidelines sentences at the request of the government, and there are several cases in which courts have granted upward departures or variances. To the former, _see, e.g._ _United States v. Ellis_ 7:21-cr-167-LSC-SGC (N.D. Ala., October 26, 2021) (Defendant sentenced to 18 months in prison, the top of the guidelines range for one count of violating 18 U.S.C. § 2243(b)); _United States v. Fuentes_, 856 F. App'x 533 (5th Cir. 2021) (Defendant sentenced to 12 months and 1 day in prison for performing oral sex on an incarcerated male in violation of 18 U.S.C. § 2243(b), where there was credible evidence from both the defendant and the victim that the act was mutually voluntary); _United States v. Bailey_, 17-cr-00504 (N.D. Ala., May 2019) (Defendant sentenced to a guidelines sentence of 18 months in prison for violating 18 U.S.C. §§ 2243 and 1001 for two instances of sexual abuse of one inmate on one occasion); _United States v. Raines_, 1:11-cr-00641 (E.D.N.Y., March 2014) (Defendant sentenced to 16 months in prison, the top of the recommended guidelines range and the defendant's motion for a non-prison sentence was denied); _United States v. Seaman_, 12cr 40o-SOM (D. Haw., July 2013) (Defendant

sentenced to a guidelines sentence of 20 months in prison for one count of violating 18 U.S.C. § 2243(b)).

As to those where courts have imposed significantly higher sentences than the advisory guidelines range in order to meet the objectives of the 3553(a) factors, consider for example, *United States v. Hosea Lee*, 5:21-cr-00084-DCR-MAS (E.D. Ky, August 1, 2022). In that case, the district court granted an upward variance and imposed an 80-month sentence on a BOP corrections officer who abused four victims while he also served as a drug treatment specialist. There, the advisory guidelines range was 18-24 months. In *United States v. Jimmy Highsmith*, 4:21-cr-00008-MW-MAF (N.D. Fla, March 17, 2022), the court sentenced imposed a variance and sentenced the defendant to 48 months in prison after conviction at trial on one count of 18 U.S.C. § 2243(b). Similarly, in *United States v. Legins*, 2020 WL 4092366, at *10 (E.D. Va. July 20, 2020), appeal dismissed, 2020 WL 8642243 (4th Cir. Sept. 11, 2020), the defendant was acquitted at trial of 18 U.S.C. § 2243(b) and other sexual abuse charges related to two sexual assaults of an inmate, but he was convicted of violating of 18 U.S.C. § 1001. Although his advisory guidelines range was 15–21 months in prison, he was sentenced to 54 months because the defendant did not "simply obstruct the FBI and OIG investigation through mere denials or offhanded remarks, but instead developed a premeditated plan and continually evolving narrative to escape culpability." In *United States v. Grimes*, 18-cr-00069 (S.D. W. Va., Jan. 2019), the court varied upward and imposed a sentence of 120 months in prison where the advisory guidelines range was 27–33 months in prison for a conviction on four counts of 18 U.S.C. § 2243(b) and two counts of 18 U.S.C. § 2244(a)(4) involving multiple victims. *But see United States v. Gamez*, 5:18-cr-00100 (C.D. Cal., April 2018) (Court denied the United States' motion for an upward variance and recommendation of an 87-month sentence, and instead sentenced the defendant to a guidelines sentence of 24 months in prison).

Finally, in *Mullings v. United States*, 2020 WL 6393014 (E.D.N.Y. Nov. 2, 2020) (2255 opinion), Mullings was a corrections officer who was supervising an inmate while she was waxing the prison floor. Mullings grabbed her, restricted her movement, and vaginally penetrated her with his penis. He pleaded guilty to one count of 18 U.S.C. § 2243(b), and his advisory guidelines range was 12 to 18 months in prison. Not unlike what the defendant wrote in his handwritten statement, Mullings described the inmate-victim as a "provocateur who grabbed his crotch, pulled down both of their pants, and backed

into him to set him up by having sex with him." Mullings at *1. There, the court varied upward and sentenced Mullings to 84 months in prison for one instance of vaginal penetration. The Second Circuit Court of Appeals affirmed the sentence as substantively reasonable. *United States v. Mullings*, 713 F. App'x 46, 47 (2d Cir. 2017). Therefore, imposing a 120-month sentence would not create an unwarranted sentencing disparity, and would likely be viewed as substantively reasonable.

## IV. <u>Conclusion</u>

For the foregoing reasons, the United States respectfully moves that this Court depart or vary from the guidelines and impose a sentence of 120 months imprisonment. Such a sentencing considers the aggravating circumstances of a kind and to a degree not considered by the Sentencing Commission, and meets the 3553(a) sentencing objectives by promoting respect for the law, reflecting the seriousness of the offense, and holding the defendant accountable for his exploitive and egregious conduct.

Respectfully submitted,

DATED: August 24, 2022

/s/  Fara Gold_____
FARA GOLD
Special Litigation Counsel

I hereby certify that notice of the foregoing was filed electronically and was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/
FARA GOLD
Special Litigation Counsel