THOMAS F. CARLUCCI, CA Bar No. 135767
  tcarlucci@foley.com
JAIME DORENBAUM, CA Bar No. 289555
  jdorenbaum@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET
SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE: 415.434.4484
FACSIMILE:  415.434.4507

Attorneys for Defendant JAMES THEODORE HIGHHOUSE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> JAMES THEODORE HIGHHOUSE, <br><br> Defendant. | Case No. 22-cr-000016-HSG <br><br> **JAMES THEODORE HIGHHOUSE'S SENTENCING MEMORANDUM** <br><br> Date:  August 31, 2022 <br> Time:  10:00 AM <br> Place: Courtroom 2 <br><br> Hon. Haywood S. Gilliam, Jr. |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................1

II. SENTENCING RECOMMENDATION ............................................................................1

III. ARGUMENT ........................................................................................................................3

    A. HISTORY OF DEFENDANT AND NATURE OF THE OFFENSE .............................4

    B. NEED FOR SENTENCE IMPOSED TO REFLECT SERIOUSNESS, PROMOTE RESPECT, AND PROVIDE JUST PUNISHMENT ...............................10

    C. NEED FOR ADEQUATE DETERRENCE AND PROTECTION OF THE PUBLIC .................................................................................................................11

IV. CONCLUSION ..................................................................................................................12

# TABLE OF AUTHORITIES

## CASES

*Boyde v. California*, 494 U.S. 370, 382 (1990) ............................................................................. 7, 8

*Concepcion v. United States*, 142 S. Ct. 2389, 2396 (2022) .............................................................. 10

*Dean v. United States*, 581 U.S. 62, 137 S. Ct. 1170, 1175 (2017) ............................................... 3, 11

*Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020) ....................................................... 11

*United States v. Beecroft*, 608 F.2d 753, 762 (9th Cir. 1979) ............................................................... 3

*United States v. Booker*, 543 U.S. 220, 245 (2005) .............................................................................. 3

*United States v. Christensen*, 732 F.3d 1094, 1104 (9th Cir. 2013) ..................................................... 3

*United States v. Williams*, 37 F.3d 82, 85 (2d Cir. 1994) ..................................................................... 4

*United States v. Quesada*, 972 F.2d 281, 283 (9th Cir. 1992) ............................................................. 3

*Williams v. People of State of N.Y.*, 337 U.S. 241, 248 (1949) ........................................................... 11

## STATUTES

18 U.S.C. § 1001 ..................................................................................................................................... 9

18 U.S.C. § 2243 ................................................................................................................................ 9, 12

18 U.S.C. § 2244 ..................................................................................................................................... 9

18 U.S.C. § 3553 .............................................................................................................................*passim*

28 U.S.C. § 994 ....................................................................................................................................... 3

## I. INTRODUCTION

Defendant James Theodore "Ted" Highhouse ("Mr. Highhouse") is a 49-year old United States Army veteran. He served two tours of duty, one each in Iraq and Afghanistan, at the peak of those conflicts, in the particularly difficult and impactful position of chaplain. Mr. Highhouse had direct responsibility for ministering to severely wounded, dying, and suicidal soldiers. This traumatic military history resulted in extreme mental health conditions, including post-traumatic stress disorder (PTSD) and major depressive disorder, exacerbated by his continued and repetitive service and collapsing family life. Mr. Highhouse's criminal conduct, including his impulsive and risk-taking behavior, directly links to his mental health diagnoses. He has proactively sought and continues to seek treatment for those challenges, and he fully regrets the pain he caused the victim in this case, as well as the other people in his life. He has no prior criminal history whatsoever and has an extensive history of service to the country, including work at the Veterans' Administration. Mr. Highhouse's separated spouse and his minor daughter live on the opposite coast, far from the potential impact of his sentencing. Further, as noted by the probation officer in the Presentence Report, Mr. Highhouse has "clearly demonstrated acceptance of responsibility for the offense," as well as assisted authorities in investigation and prosecution by notifying them of his intent to plead guilty. Presentence Report ("PSR"), ¶¶ 96-97. Especially given Mr. Highhouse's efforts to treat his conditions, his sincere remorse, and his acceptance of responsibility, a sentence of incarceration must be "sufficient, but not greater than necessary," to effectuate the goals of sentencing outlined in 18 U.S.C. § 3553(a). For these reasons, discussed below, Mr. Highhouse respectfully requests that this court impose a sentence in accordance with this statutory principle of parsimony.

## II. SENTENCING RECOMMENDATION

Mr. Highhouse requests a sentence of incarceration at the low end of his calculated Sentencing Guidelines range of 24-30 months, at 24 months, in accordance with the parsimony principle. The PSR notes that Mr. Highhouse has no criminal history. PSR, ¶ 3, 102. This means that under the United States Sentencing Guidelines, Mr. Highhouse's Criminal History Category is I. *Id.*, ¶ 102. Further, Mr. Highhouse's final total offense level includes a two-level reduction, because he has "clearly demonstrated acceptance of responsibility for the offense." *Id.*, ¶ 96. Finally, the PSR points out that Mr.

Highhouse assisted authorities by his guilty plea, lowering his total offense level by another level. *Id.*, ¶ 97. At Mr. Highhouse's criminal history level of I and total offense level of 17, the Guidelines advisory range of a term of incarceration is 24 to 30 months. *Id.*, ¶ 156. This final total offense level is the product of examining all the factors outlined in the applicable Guidelines; the range does not appear out of a vacuum. Mr. Highhouse requests that the Court impose a sentence consistent with this calculated range and the applicable term of incarceration.

The final PSR adopts an extremely punitive recommendation of a term of imprisonment for 60 months, despite stating "the undersigned officer is in agreement with the proposed guideline calculations as set forth in the Plea Agreement." PSR, Addendum, p. 4; ¶ 3. The PSR also points out that "the defendant has been compliant with all conditions of release" according to Pretrial Services. *Id.*, ¶ 4. Further, Mr. Highhouse's Pretrial Services Officer in the District of Oregon states Mr. Highhouse has been compliant, and that he spends his time caring for his elderly mother and handling estate issues for his father, who passed of a severe heart attack early this year. *Id.*, ¶ 5, 112, 118. The PSR consistently and repeatedly points out Mr. Highhouse's complete lack of criminal history and his calculated Guideline range, including both increases and reductions. The suggested imposition of 60 months of incarceration is inconsistent with the remainder of the Report and is twice as long as the maximum of the calculated Guidelines range—and lacks an articulated, Guidelines-supported ground for departure.

The PSR itself states unequivocally: "[b]ased upon a total offense level of 17 and a criminal history category of I, the guideline imprisonment range is 24 to 30 months." *Id.*, ¶ 156. Mr. Highhouse respectfully requests that the Court impose a term of incarceration that is sufficient, but no longer than necessary to promote the § 3553(a) factors, as well as consistent with the appropriate Guidelines range. The mitigating factors discussed below warrant a sentence that falls on the low end of the advisory Guidelines range, taking into account those factors, Mr. Highhouse's complete lack of prior criminal history, and his acceptance of responsibility. Imposing a sentence at the low end of this advisory range—of no more than 24 months—is sufficient to further the aims of § 3553. A sentence of incarceration outside the calculated range would be "greater than necessary" as unnecessarily punitive and duplicative, as supported by the factors discussed below.

//

## III. ARGUMENT

18 U.S.C. § 3553(a), governing imposition of a federal sentence, states that "[t]he court *shall* impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." (emphasis added). This "parsimony principle" is a "broad command" that requires courts to impose a sentence no greater than necessary "to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 137 S. Ct. 1170, 1175 (2017) (internal citations omitted). The United States Sentencing Commission promulgated the Guidelines to promote transparency and proportionality in sentencing under 18 U.S.C. § 3553. In fact, "[r]ead harmoniously as a whole, the statute *requires* a court to impose a sentence of the kind and range established by the Sentencing Commission. No command exists in the statute that the court devise its own standard of what is "sufficient, but not greater than necessary." *United States v. Quesada*, 972 F.2d 281, 283 (9th Cir. 1992) (emphasis added). A sentencing court may, in its discretion, tailor a sentence in light of the statutory concerns enumerated in 18 U.S.C. § 3553(a). 18 U.S.C. § 3553(a)(4); *U.S. v. Booker*, 543 U.S. 220, 245 (2005); *U.S. v. Beecroft*, 608 F.2d 753, 762 (9th Cir. 1979). However, 18 U.S.C. § 3553(a) requires the Court to impose a sentence that is exactly sufficient to comply with the purposes set forth in the statute.

In imposing a sentence aligned with the parsimony principle, courts consider factors including (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment, to afford adequate deterrence to criminal conduct, to protect the public from a defendant's further crimes, and to provide the defendant with needed education or vocational training or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(1), (2)(A)-(D). To this end, courts have wide discretion to consider a defendant's personal history in determining a reasonable sentence. *Beecroft*, 608 F.2d at 762. Subject to constitutional constraints, the sentencing court may rely on any evidence relating to defendant's background, character, and conduct when considering the statutory sentencing factors. *See U.S. v. Christensen*, 732 F.3d 1094, 1104 (9th Cir. 2013).

The Sentencing Guidelines, although flexible, are not fragile. They are the constantly amended and modernized product of an independent judicial agency, empowered under 28 U.S.C. § 994 to

4893-6921-0414.5

"promulgate and distribute [the Guidelines] to all courts of the United States." Overall, the Sentencing Guidelines are the mechanism by which to impose a sentence in line with the parsimony principle of "no greater than necessary" under 18 U.S.C. § 3553(a). Both statutory and case law require consciously measuring the proposed degree of departure in the PSR against the standards in the statute and the Guidelines. Where the PSR adopts a recommendation for a sentence more than twice as long as the appropriate, Guidelines-supported range, such examination of the defendant in light of the statutory factors is essential. *See U.S. v. Williams*, 37 F.3d 82, 85 (2d Cir. 1994) ("Although the Guidelines afford the district court flexibility in sentencing, the power to depart is to be used sparingly and is reserved for unusual cases."). Here, that conscious measuring necessitates careful examination of the natures of both the offender and the offense.

### A. History of Defendant and Nature of the Offense

Mr. Highhouse was born on June 23, 1972, in Portland, Oregon. PSR, ¶ 112. He currently lives in Portland with his elderly mother, for whom he helps provide care. *Id.* His father died earlier this year of a massive heart attack, following Mr. Highhouse's efforts to save his life with CPR. *Id.*, ¶¶ 112, 118. Beyond his care for his parents, however, the most impactful aspect of Mr. Highhouse's adult life is his record of service to his country. Mr. Highhouse has an extensive and decorated military history as an Army chaplain who served two tours of duty—once each in Iraq and Afghanistan, each at the height of those respective conflicts. While in the Army, Mr. Highhouse tended and ministered to wounded warriors, many of whom died following combat wounds or committed suicide. *Id.*, ¶ 120. From February 1, 2006 to August 1, 2014, Mr. Highhouse served in this capacity and achieved the rank of Captain. *Id.*, ¶ 150. He served in Iraq from 2006 to 2008 and in Afghanistan from 2011 to 2012 and received an honorable discharge. His service record and ministry to fellow wounded, dying, and suicidal soldiers earned him a variety of decorations. Mr. Highhouse's Certificate of Release or Discharge from Activity Duty (Form 214) lists the following decorations, medals, and badges:

- Afghanistan Campaign Medal with Campaign Star
- Iraq Campaign Medal with Two Campaign Stars
- Meritorious Service Medal
- Army Commendation Medal (3rd Award)

- Meritorious Unit Commendation
- National Defense Service Medal
- Global War on Terrorism Service Medal
- Army Service Ribbon
- Overseas Service Ribbon (2nd Award)
- NATO Medal

He married Joyce Highhouse in 2011, immediately prior to his deployment to Afghanistan, the second such deployment as an active duty chaplain. *Id.*, ¶ 119. This "traumatic" yearlong deployment strained their relationship; the two eventually separated and Joyce filed for divorce. *Id.* They have one minor daughter, who resides with her mother in North Carolina. *Id.*, ¶ 124. Their divorce and child custody issues remain unresolved. *Id.*, ¶ 129. These issues have caused Mr. Highhouse a "significant amount of stress." *Id.* Following his extensive service as a chaplain, Mr. Highhouse obtained a Doctor of Ministry to add to his Master of Divinity and bachelor's and associate's degrees. PSR, ¶ 146. During the latter half of 2014 and all of 2015, he was employed full-time as a chaplain at the Veterans' Administration in Palo Alto. *Id.*, ¶ 149. He was unable to maintain this position due to ongoing familial issues and the four-hour daily commute from his home. *Id.*, ¶ 123, 149. At this point, his marriage was "significantly strained." *Id.*, ¶ 123. Later, in 2015, Mr. Highhouse assumed his position as chaplain at the Federal Correctional Institution, Dublin, where the events that gave rise to the pled offenses took place. *Id.*, ¶ 125.

Although fortunate not to suffer extreme abuse or trauma in childhood, Mr. Highhouse's adult life has been far from trauma-free. During his service as a chaplain in the military, Mr. Highhouse witnessed a variety of gruesome and traumatic events that left him with diagnoses of major depressive disorder and post-traumatic stress disorder. PSR, ¶ 138. He now takes regular medication for these issues, and he has attended regular therapy for treatment of these long-ongoing and traumatic cognitive ailments since July 2020. *Id.*, ¶¶ 137-140. Mr. Highhouse recounts a variety of experiences as a chaplain that contributed to these issues. They include chronic exposure to trauma in the form of high death tolls, high rates of suicide, and an extreme operational tempo that, at times, put Mr. Highhouse in the path of rocket and mortar attacks. All the while, Mr. Highhouse suffered from severe mental health problems

related to these events, but felt unable to seek help in the military, for fear of the stigma associated with mental illness. PSR, ¶ 122. However, Mr. Highhouse did not just experience the terror lived by his company, but also the horror in ministering to them himself, in unimaginable conditions.

Over the course of his service, Mr. Highhouse estimates that he specifically ministered to around three hundred and fifty wounded and dying soldiers in the field. Before even his first deployment to Iraq in 2006, two soldiers in his brigade were killed in training accidents prior to deployment, and Mr. Highhouse was directly responsible for crisis intervention care in these extremely emotional incidents. This, however, was only the beginning of Mr. Highhouse's service in such conditions. After arriving in east Baghdad, Mr. Highhouse's brigade was extended to 15 months just a few months after his deployment. Mr. Highhouse was the aid station chaplain seven days a week, at the main triage point in east Baghdad, which had a high casualty frequency due to the high concentration of insurgent activity. There were at least 276 soldier deaths in his brigade in Iraq. Mr. Highhouse ministered hundreds of wounded soldiers, provided end of life care for multiple deaths, and went on combat patrols in a volatile city. Due to this volatility, Mr. Highhouse's ministry extended to several mass casualty events due to regular bombings—bombings in which Mr. Highhouse was almost killed three times.

Mr. Highhouse, suffering from chronic burnout, returned to the United States in January 2008. Just months later, without sufficient decompression, Mr. Highhouse was assigned to the Army's Warrior Transition Unit in July 2008, due to his experience in combat medical ministry. This one-year assignment gave Mr. Highhouse responsibility for 400 formerly deployed, medically unfit soldiers with acute health conditions. Conditions in this assignment exacerbated Mr. Highhouse's burnout symptoms from his Iraq deployment—including six suicide completions in the first six months, with regular attempts. During his next assignment in Ft. Drum, New York, Mr. Highhouse's infantry battalion was picked in July 2009 to deploy immediately to Afghanistan. Due to his already-present mental health conditions, Mr. Highhouse was moved to a non-deploying unit, which caused further scrutiny over Mr. Highhouse's mental health. Finally, Mr. Highhouse deployed to Afghanistan in October 2011, just one month after his marriage. During this deployment, Mr. Highhouse tended to yet more wounded and suicidal soldiers, and faced the dangers of rocket fire himself. During this tour, the day before Mr. Highhouse was scheduled to go home, a fellow soldier shot himself at the aid station. Finally, Mr.

Highhouse covered another unit whose chaplain was sent home after a rocket attack injury. Covering them for three months, this additional duty made Mr. Highhouse responsible for around one thousand soldiers if called upon.

Mr. Highhouse personally watched his fellow soldiers die from indescribable injuries, both physical and mental, for years. He took on an unimaginable responsibility of ministering to them, and his own injuries from that service are long lasting and deep. Mr. Highhouse's extreme and extensive trauma warrants significant and consistent treatment—as well as significant consideration at sentencing.

This trauma and the extensive mental health concerns that followed contributed heavily to Mr. Highhouse's commission of the charged offenses. Mr. Highhouse notes in a written statement to Probation that part of what influenced him to commit the pled offenses was a deep struggle with his mental health, including impulse control problems from PTSD, depression, and anxiety. PSR, ¶ 61. Mr. Highhouse points out his struggle with impulse control due to PTSD, his lack of support system, his collapsing marriage, and concerns over his daughter's health. *Id.* Despite these struggles that contributed to the commission of these offenses, Mr. Highhouse maintains acceptance of responsibility and knowledge that he made a grave mistake. However, imposing a sentence greater than necessary would unduly impact Mr. Highhouse's ability to obtain treatment he still needs, in both therapy and medicinal intervention for his mental health. The Supreme Court has found and reiterated "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to . . . emotional and mental problems, may be *less culpable than defendants who have no such excuse*." *Boyde v. California*, 494 U.S. 370, 382 (1990) (emphasis added) (internal citations omitted). Here, Mr. Highhouse's severe mental health struggles, most notably his PTSD, circumscribe his culpability, especially where his criminal conduct occurred subsequent to his military service.

First, PTSD has been associated with risky sexual behavior, particularly among male military veterans. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3305816/ ("Recent investigations have demonstrated that posttraumatic stress disorder (PTSD) is associated with a range of impulsive behaviors."[1] Specifically, impulsive behaviors for which individuals with PTSD are at risk include

---

[1] Weiss NH, Tull MT, Viana AG, Anestis MD, Gratz KL. *Impulsive behaviors as an emotion regulation strategy: examining*

"risky sexual behavior." *Id.* In a study examining the prevalence of compulsive sexual behavior among male military veterans, the research suggested "male veterans may be at particularly high risk for CSB [compulsive sexual behavior]." This study further found "traumatic experiences [including] PTSD symptoms resulting from either combat or other trauma exposure, were significantly associated with CSB." Finally, "among those with PTSD, re-experiencing symptoms specifically were associated with CSB." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4291826/.[2] As noted above, Mr. Highhouse continually re-experienced the same traumatic events in the military that gave rise to his PTSD initially. He also continued, and still continues, to re-experience those traumatic events when recounting them for mental health treatment. Finally, "[h]eightened PTSD-related negative affect and externalizing behaviors preceded high-risk sexual events" for a sample of male veterans in a study examining the association between PTSD in veterans and increased sexual risk behaviors. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4684959/.[3]

      Mr. Highhouse's criminal conduct is consistent with the research establishing a link between PTSD and engagement in impulsive and risky sexual behaviors. Because of the impact and re-experience of his PTSD, Mr. Highhouse is less culpable when it comes to impulsive, risky sexual behavior than a defendant who had no such condition. *See Boyde*, 494 U.S. at 382. Here, however, Mr. Highhouse does not stand behind his mental health as an excuse—he accepts responsibility, as noted above and in the PSR, but acknowledges the role that his PTSD, depression, and anxiety played. Further, Mr. Highhouse will continue to seek treatment for these conditions, in continued acknowledgment of the role they play in his life. The parsimony principle counsels that the sentence be no greater than necessary to effectuate the sentencing factors, which include the need to "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Sentencing him to a duplicative or unnecessarily punitive sentence of incarceration would impair his ability to maintain his efforts to address and treat these

---

*associations between PTSD, emotion dysregulation, and impulsive behaviors among substance dependent inpatients.* J. Anxiety Disord. 2012 Apr; 26(3):453-8.

[2] Smith PH, Potenza MN, Mazure CM, McKee SA, Park CL, Hoff RA. *Compulsive sexual behavior among male military veterans: prevalence and associated clinical factors.* J. Behav. Addict. 2014 Dec; 3(4):214-22.

[3] Black AC, Cooney NL, Justice AC, Fiellin LE, Pietrzak RH, Lazar CM, Rosen MI. *Momentary assessment of PTSD symptoms and sexual risk behavior in male OEF/OIF/OND Veterans.* J. Affect. Disord. 2016 Jan 15; 190:424-428.

mental health concerns "in the most effective manner."

The nature of the charged offenses as the first crimes that Mr. Highhouse has ever committed speaks to the factors that motivated their commission. As confirmed by the Presentence Report, Mr. Highhouse has no prior criminal history whatsoever, and his corresponding Criminal History Category is I. PSR, ¶ 102. Further, none of the unproven accusations against Mr. Highhouse are alleged to have occurred prior to his extensive and traumatic military history. In this federal case, Mr. Highhouse pled guilty to sexual abuse of a ward under 18 U.S.C. § 2243(b) (Counts 1 and 2), abusive sexual contact under 18 U.S.C. § 2244(4) (Counts 3 and 4), and making false statements under 18 U.S.C. § 1001 (Count 5). The events giving rise to these charges occurred at the Federal Correctional Institution, Dublin, in Alameda County. Mr. Highhouse has not litigated this matter, but willingly pled guilty to serious offenses. He has extensively demonstrated remorse for his actions and a willingness to try to correct the factors that contributed to the offenses. Mr. Highhouse's role in these offenses was not that of a mastermind manipulator but that of a veteran with acute mental health conditions, who made a severe mistake. Mr. Highhouse knows he committed very serious offenses during the course of the events that took place at FCI Dublin. Although the acceptance of responsibility does not erase the offense, Mr. Highhouse's own words are perhaps the best indicator of his view on the nature of the offense:

> "I feel horrible and am truly and deeply and sincerely sorry for having committed this offense. I am sorry for any pain and suffering my actions have caused the victim to experience. I own [and] take full responsibility for my actions. I made a mistake and I apologize for what I have done."
>
> PSR, ¶ 59.

The sentencing statute, 18 U.S.C. § 3553(a), specifically requires that the Court "shall consider . . . the nature and circumstances of the offense and characteristics of the defendant" in determining the sentence. The proximity of these factors in the statute—and their proximity in Mr. Highhouse's case—support the necessity of considering them in tandem. Although the nature and circumstances of the crimes themselves are extremely serious, statutory and case law authority requires the consideration of the offender, not just the offense.

### B. Need for Sentence Imposed to Reflect Seriousness, Promote Respect, and Provide Just Punishment

The Supreme Court recently reiterated the principle that "[w]hen a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction." *Concepcion v. United States*, 142 S. Ct. 2389, 2396 (2022). A sentence conforming to the principle of parsimony will be more than sufficient to reflect the seriousness of the charges to which Mr. Highhouse pled. As noted in the PSR, Mr. Highhouse has accepted responsibility and expressed remorse due to the seriousness of the charged conduct. The PSR notes that he entered a guilty plea and "was cooperative with the probation officer." PSR, ¶ 57. He notes in the written statement provided to Probation that he "own[s] [and] take[s] full responsibility for [his] actions." He points out "I made a mistake and I apologize for what I have done." When Mr. Highhouse appears for sentencing, the Court must consider him as he appears then, and should consider the extensive demonstration of Mr. Highhouse's remorse and his efforts to treat the problems that contributed to the pled offenses. Mr. Highhouse acknowledges the seriousness of his offenses and understands the need for the sentence to reflect that seriousness. For that reason, increasing the imposed sentence on the sole basis of impressing seriousness would be unduly punitive and at odds with the parsimony principle.

Further, imposing an increased sentence on the basis of promoting respect for the law is unnecessary in this case. Mr. Highhouse is well aware of the necessity of respect for the law, and demonstrated it during the pendency of this federal case. He willingly pled guilty to Counts One through Five just over a month after the information was filed. PSR, ¶¶ 1-2. Further, after Mr. Highhouse voluntarily self-surrendered by appearing for his initial appearance, he has been compliant with all conditions of release including attending treatment services. *Id.*, ¶ 4. Mr. Highhouse's Pretrial Services Officer in the District of Oregon has further confirmed his cooperation and compliance with all of his terms. *Id.*, ¶ 5. Mr. Highhouse's cooperation with Pretrial Services and Probation; compliance with all the terms of his release; and willingness to proceed with sentencing after pleading guilty demonstrates an economical use of government and judicial resources. Increasing an imposed sentence on the basis of promoting respect for the law is unnecessary in this case and would work against the principle of parsimony that prefaces 18 U.S.C. § 3553(a).

Finally, a sentence of incarceration that is sufficient, but no greater than necessary, would justly punish Mr. Highhouse for the offenses to which he pled guilty. Mr. Highhouse understands the potential penalties he faces and has already suffered consequences of the offenses he committed. He notes that "[b]ecause of this case I ripped apart my marriage [and] family." PSR, ¶ 60. He also points out that he is going through a "very painful divorce" and that his "daughter has suffered immensely," and finally that his elderly parents had experienced "significant stress" due to the pendency of his federal case. *Id.* In other words, Mr. Highhouse recognizes the impact his criminal conduct has had on his loved ones. An appropriate Guidelines-range sentence of incarceration will justly punish Mr. Highhouse for the offenses to which he pled guilty. "The substantive standard that Congress has prescribed for trial courts is the 'parsimony principle' enshrined in § 3553(a)." *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020); *see Dean*, 137 S. Ct. at 1175 (2017). Even far prior to the adoption of the Sentencing Guidelines, the Supreme Court recognized that "[r]etribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence." *Williams v. People of State of N.Y.*, 337 U.S. 241, 248 (1949) . The Supreme Court further agreed that "the punishment should *fit the offender and not merely the crime*." *Id.* at 247 (emphasis added). Mr. Highhouse has pled guilty and accepted responsibility for serious crimes. However, Mr. Highhouse has also identified mitigating factors that contributed to his grievous mistakes in committing these offenses. Just punishment in this case does not require undue or excessive imposition of incarceration—rather; just punishment requires a careful examination of not only the crime, but also the offender.

### C. Need for Adequate Deterrence and Protection of the Public

Mr. Highhouse requests that the Court consider the weight of these factors in the context of imposing a punishment not greater than necessary to accomplish the purpose of the statute. Mr. Highhouse is unlikely to reoffend. The circumstances that led to his criminal conduct in this case—presence around prison inmates, extreme mental health issues, and a collapsing personal life—either no longer exist or are in the process of resolution. First, Mr. Highhouse will never work in a position like his chaplain position at FCI Dublin again. Additionally, as detailed further in the PSR and this memorandum, Mr. Highhouse has demonstrated a consistent effort to treat his mental health and to comply with his pre-sentencing conditions. This willingness to confront the potential of a term of

incarceration and potential supervised release by the government indicates Mr. Highhouse's extreme low likelihood of recidivism. Increasing an appropriate Guidelines-range sentence of incarceration beyond a term that is "sufficient" under 18 U.S.C. § 3553(a) would be excessively duplicative and punitive.

Further, an excessive term of incarceration is not necessary to "protect the public from further crimes" under 18 U.S.C. § 3553(a)(2)(C). Again, Mr. Highhouse will never be in a position anywhere near "wards," as contemplated by 18 U.S.C. § 2243(b), to which Mr. Highhouse pled guilty. No facts to which Mr. Highhouse pled evince his propensity to attempt or commit another offense like the ones before the Court in the future. Mr. Highhouse has consistently sought treatment for the conditions that most significantly contributed to his sexual misconduct and will continue to do so in the future. Imposing an appropriate Guidelines-range sentence of incarceration will be more than sufficient to protect the public while Mr. Highhouse serves his sentence, and any potential supervised release will amply effectuate any further protection of the public that the Court deems necessary. Further, to the extent there is any concern over Mr. Highhouse's proximity to his estranged wife and daughter, they both reside in North Carolina. PSR, ¶ 124. Further, to the extent the Alameda family court does not participate further due to the geographic location of the parties, there will be a family court of competent jurisdiction to deal with those potential concerns. Keeping Mr. Highhouse literally, physically in prison to protect the public at large would be unnecessarily punitive—especially where Mr. Highhouse has complied with every single condition imposed on his current release. PSR, ¶¶ 4-5. Mr. Highhouse's cooperation and compliance during the pendency of this sentencing demonstrates the lack of a need to imprison him for an unnecessarily long period.

## IV.     **CONCLUSION**

Mr. Highhouse is a traumatized veteran with an extensive service record, severe mental health concerns, and a complete lack of criminal history, who has sincerely accepted responsibility for the offenses to which he pled. He has demonstrated a respect for the law and the conditions of his release, potential incarceration, and potential supervised release. He chose to proceed to sentencing to expend governmental resources effectively and to face the court to further the purposes of sentencing outlined in the United States Code. For the foregoing reasons, Mr. Highhouse, through his counsel, respectfully

requests that this Court maintain the principle of parsimony and impose a sentence that is "sufficient, but not greater than necessary" to effectuate the purposes of 18 U.S.C. § 3553.

DATED:  August 24, 2022

**FOLEY & LARDNER LLP**
Thomas F. Carlucci
Jaime  Dorenbaum


*/s/ Thomas F. Carlucci*
Thomas F. Carlucci
Attorneys for Defendant
JAMES THEODORE HIGHHOUSE